Ms. Madness, you have reserved two minutes for rebuttal. Yes. All right. Good morning. I've raised five substantive issues in this case, which has an extremely lengthy record, and I have limited time, so I can only highlight a few things for you. Dr. Belfiore was charged with illegally prescribing Oxycodone to three patients. He raised a good-faith defense, which under then-settled law in this circuit and elsewhere, and also pursuant to the judge's jury charge, required an objective standard of reasonableness. To be acquitted, the doctor had to establish that his belief was not only that his prescriptions were authorized, but that that belief was reasonable. But he didn't have to establish that, right? Excuse me? The government had to prove that he knew that what he was doing was wrong, right? Yes, but in the good-faith defense, the standard for determining whether it was reasonable was an objective one, whether he reasonably believed that his prescriptions were lawful, not whether he just simply actually believed that, even if unreasonable. So Ron changed that and required that the test be completely subjective. The government has completely ignored the good-faith charge, which is on page 51 of our opening brief, and I urge your honors to look at it, because it did include an extra step for the jury, which not only involved the mens rea elements, but required the jury to consider whether the doctor's belief that his prescriptions were lawful. Objectively reasonable. Otherwise, he had to be convicted. You have a very strong argument that the that the charge was not in accord with ruling, but the government's main answer to that is that that doesn't meet the plain error test because there was such powerful evidence of there was such powerful evidence in his in his fabricating records and falsifying records. There was very, very clear, strong evidence of his subjective knowledge of the illegality. Well, you're on the argument you need to deal with. Yes, I'd be happy to. I have discussed in my brief exhaustively the proof at trial, which not only included the doctor's testimony, and he testified for three days, but it included the testimony of his expert who said that all of the decisions the doctor made were reasonable. And I just want to point out to your honors again that the jury, even at incorrectly charged with essentially a charge that lowered the burden approved by the government, they took four and a half days to convict Dr. Balfour. And the very last question they asked was for a detailed explanation of the meaning of beyond a reasonable doubt. So the juries, the jurors who actually heard all this evidence clearly had significant problems with the proof. They did not find it overwhelming. Four and a half days of deliberations is a very long time, as I'm sure you will agree, based on your knowledge of criminal cases. Do you think we can infer that they were having a tough time deciding this because of the amount of time they took to deliberate? Yes, because the only defense that was raised here was the good faith defense. There was an entrapment defense that was presented with respect only to the undercover officer counts, and I respectfully submit that that defense was essentially frivolous. But for all of the substantive counts of prescribing isocodone, the only defense that covered all of them was the doctor in good faith believed that his prescriptions were authorized and legitimate. And so I think the jury, given that was the only issue they had to consider, that that was, it's important that they took so long to reach a guilty verdict. And especially with the asking for the detailed explanation of proof beyond a reasonable doubt. I will also remind the court that in his decision denying post-conviction relief, then District Court Judge Bianco commented on the good faith defense specifically, that it was both viable and robust. And that's, I think I miscited the opinion sites in my brief, but the opinion sites are at pages 50 to 51 and 81. The judge who, like the jurors, also heard all this evidence, including the expert testimony, found that this defense was viable and robust. So I think that undercuts the government's claim of overwhelming evidence as well. And finally, I want to remind the court that we have raised a sufficiency argument with respect to the counts related to patient Martin. And I submit that the case, that the proof of guilt on that, on those counts, was not only weak, but it was legally insufficient. And again, I have exhaustively discussed the facts in my briefs, and I don't believe I have time to recount them here, but I urge you to look at the opening brief, pages 43 to 47, and the reply brief, pages 12 to 14. The only point the government makes that has any basis in the record is that the doctor prescribed oxycodone to a patient who was an alcoholic. But in fact, the record does not bear out that strong statement. In the first visit by Mr. Martin, he didn't mention he was an alcoholic. In fact, he didn't say anything about his drinking, and the doctor asked him about it and made an indication as he explained to trial that he had basically a drink a day. In his second visit, the patient said that he was an alcoholic and was then attending AA meetings. He didn't say he had a drink, that he was currently drinking, and in fact, that he was going to AA meetings belies the fact that he was currently drinking. And the toxicology report that was conducted by the doctor on the second visit and also the toxicology report done at the autopsy showed that there was no alcohol in Martin's system. He was not drinking. So alcohol had actually nothing to do with his death, and the doctor had no reason to think that he was actively drinking and that prescribing oxycodone was a problem. If he did think this was a problem, it is odd that he flagged this information about admission that the patient was an alcoholic in his chart. If he wanted to cover up the concern that he was prescribing an opioid to an active heavy drinker, then he would not have included any of this information in his chart. So I think that's another reason that the court should consider the evidence as far from overwhelming in this case. It really wasn't. The decisions the doctor made with respect to Martin, who he only saw twice, with respect to patient Eubanks, who he saw for three and a half years, and his health conditions were established, and one of the red flags was that he smoked marijuana, as his tox report showed. However, the doctor actually called him on that and told him to stop that, and there were no other indications that he ever had marijuana in his system. So I also have the interest of witness charge, as you know, which the government concedes was error, and on the harmlessness argument on that point, I just want to remind the panel that the doctor testified for three full days, and the government's argument on summation was replete with arguments that the doctor's testimony was incredible, that he was lying, that he presented false information. Credibility of the doctor was of paramount concern to the government on summation. So for them to say that the interest of witness charge, which focused the jury as a matter of law on the doctor's motive to lie because he was an interest of witness, can't be dismissed as harmless. I have two other evidentiary points that, again, are very fact-specific, but I want to say on the admission of the medical records of John Ortega, which was uncharged conduct, the district court's decision was that it was inexorably intertwined with the other evidence, with the undercover's testimony, which is simply not the case. It was very clear, simple, and easily excised. The undercover simply said that he knew. Why does that matter in view of the fact that that reason for admitting the evidence was given by the district court before entrapment had been introduced into the case? I don't know why the government doesn't argue in its brief entrapment the rebuttal to the entrapment defense, but after the district judge had admitted this evidence pretrial on the inextricable intertwinement theory, then entrapment was raised, and I can't see any reason in the world why this isn't admissible as rebuttal to the entrapment defense. It seems to me it's much more pertinent than the information about his treatment of other patients, which didn't go to the length of showing that it was improper, illegal prescription. In this case, it did, and it's therefore much more pertinent to the entrapment defense. Your Honor, the government had, with respect to the two charged patients, Martin and Eubanks, it had evidence that the doctor routinely prescribed oxycodone to those patients. This was for years. He saw Eubanks for years, and this was before he saw the undercover officer. So clearly he was familiar with oxycodone and was willing to prescribe it. And so that was relevant to the entrapment defense. They didn't need the Ortega evidence. They didn't need it, but still my point is that if the government had already known about the entrapment defense at the point at which the relevance and admissibility of the Ortega information had been discussed, it seems to me it would have been obvious that the government would have raised the entrapment defense, the rebuttal to the entrapment defense at that time. But it's still pertinent now. It's still a reason why the Ortega evidence was admissible as a rebuttal to the entrapment defense, even though it had previously been admitted for a different reason, which you argue was not- It was, with all due respect, the relevance of the Ortega evidence of entrapment was negligible under a Rule 403- Why? Under a Rule 403 balancing test. It was clearly more prejudicial and prohibitive. And furthermore, the Ortega records was not simply a listing of how many oxycodone pills the doctor prescribed to that patient. It was 150 pages of medical records that were highly prejudicial about showing that the Ortega showed several red flags in his use, that he was going to different pharmacies to fill his prescription, indicating that he knew he was getting too much- All of that made it more pertinent as a rebuttal to the entrapment defense of showing his predisposition to- The entrapment defense only made relevant the doctor's familiarity with oxycodone. Why? Because he had- No, that's just false. That's just not correct. The issue was whether- the issue was not whether he prescribed oxycodone. It's whether he improperly prescribed oxycodone. And therefore, all the information about his prescribing oxycodone to other patients numerous times has marginal relevance to rebutting the entrapment defense if it didn't show that he was improperly prescribing it to these other patients. So the Ortega defense- the Ortega information is all the more pertinent to the rebuttal of the entrapment defense because it showed improper prescription of oxycodone. I think the issue for the jury on entrapment was whether he was predisposed to prescribe oxycodone. That was the theory of the charts showing his entire history- prescription history of prescribing oxycodone having nothing to do with whether the prescriptions were legitimate or illegitimate. It was simply that he was familiar with the drug and he would have prescribed it anyway to the undercover. That's what the theory of invisibility was. And the Ortega evidence went well beyond proving predisposition. It showed, as I said, highly prejudicial evidence that surpassed anything the government can come up with about the conduct at issue with the charged patients. If there's no further questions, I will see you again in rebuttal. Right. We've got two minutes for rebuttal, so we'll now hear from Mr. King on behalf of the government. Thank you, Your Honors. Good morning. My name is Bradley King, and along with my colleagues, David James and Charles Rose, I represent the United States. This case presented absolutely overwhelming evidence that the defendant knowingly and intentionally acted as a drug dealer when he illegally prescribed thousands of the highest strength oxycodone pills to an undercover officer and two men who died in the prime of their lives based upon the defendant's illegal prescriptions. As such, this court should affirm the jury's unanimous verdict on all counts that were brought against the defendant. As recounted in the government's brief, this record is replete with evidence of the defendant's subjective knowledge that he was illegally prescribing oxycodone outside the bounds of legitimate medical practice. For that reason, taking the second point in his appeal first, any error under Ruan would be harmless because there is just overwhelming evidence that this defendant subjectively believed that he was illegally prescribing oxycodone. We don't have to guess about what he believed. In a video recording with a second undercover officer, he states unequivocally, oxycodone is dangerous. If I'm going to prescribe it to you, I need more than your request for it. I need to do a thorough physical exam. I'm going to need tests. I'm going to need to be very careful. Why? He says it in visceral terms. Oxycodone is a ball and chain that will get you hooked and you will drag it around for the rest of your life. He knows it's dangerous absolutely unequivocally on this record. That is absolutely overwhelming evidence. What does he do with that knowledge? He colludes with a second undercover officer to illegally prescribe oxycodone. When that undercover officer comes in, he has no medical records. All he has is his say-so that he would like the highest strength of oxycodone, which he obtained illegally from an individual named John Ortega, who was the defendant's patient at the time. What does the defendant do with that information when he's told, I've got some Oxy30 pills from John Ortega? He says, don't worry. It's not me that you or Ortega have to worry about. It's whether or not you hand one of those pills off to a plant. This defendant is not acting as a physician in that moment. He is acting as a criminal, colluding with another person to illegally prescribe oxycodone. The reference to Ortega led him immediately to speak about potential detection by law enforcement, and that's why Ortega's medical file was so important. Also important were the defendant's repeated lies when he was dealing with the first undercover officer. He is repeatedly in real time recording things in his file to make it look like he's doing actual treatment because he knows the standard of care, but he's not doing any actual treatment at all. He's saying that the officer was following his program. He wasn't. Records show that. He's saying that the undercover was telling him that his pain was decreasing. He wasn't. What he was saying was, thanks for the oxys. Can I have some more? And when he says that, the defendant, again, showing that he's a criminal, says, I could get you some more, but we'll need to get an x-ray so we have something to show the state. Why was he worried about that? Because he had nothing to show the state. He knew what he was doing was absolutely illegal, and that's why, to the extent there's any Rwanda error here, it's harmless. And that's just some of the evidence. These false entries were in Ortega's file as well. Ortega was repeatedly engaging in aberrant conduct that could have led to his death from overdose, and the defendant is actually writing in that file that he's using the medication as directed. He didn't just lie in Ortega's file. He lied in the file of another individual who died of an overdose, who he entered false entries into that person's record, and then attempted to suborn perjury. Is the Ortega evidence admissible as to rebut the entrapment defense? I certainly think it could have been, Your Honor. I certainly think it could have been. It would show that at the time he was asked, he was already ready and willing to commit a crime. That's exactly what it would show, and that's exactly an appropriate response to an entrapment defense. But in this case, Judge Bianco's ruling appropriately focused on the defendant's state of mind. Well, that means Judge Bianco made that ruling pre-trial before the entrapment defense had been raised. That's fair, Your Honor. At that time, it would have been inappropriate to consider an entrapment defense because there was no entrapment defense. That's absolutely correct, Your Honor. But when there was an entrapment defense, as of the opening statements in the trial, that Ortega evidence became admissible as rebuttal to the entrapment defense. Absolutely. That certainly would be a sensible approach. This defendant knew the standard of care, and he was repeatedly trying to cover his tracks. I want to take issue with something that Mr. Belfiore's counsel mentioned during her argument. RUAN does not do away with an objective standard. RUAN allows the government, as we did in this case, through the testimony of a credible expert witness with decades of experience in pain management, to enter evidence of the objective standard and allows the jury to evaluate the defendant's actions and statements against that objective standard to determine whether or not the defendant had the subjective belief that he was illegally prescribing oxycodone. So there's no doing away with an objective standard in RUAN. RUAN recognizes that there's an objective standard. What it doesn't permit is a jury to decide that the defendant either believed that he was subjectively violating the law or he should have known. In this case, he absolutely believed he was violating the law. That's why he was repeatedly trying to cover his tracks. When it comes to Edward Martin, it's important to understand that the record is, again, complete. But if a charge, through ambiguity or whatever, permits a jury to convict on the grounds that the defendant didn't reasonably believe that his conduct was lawful, even though he subjectively believed his conduct was lawful, that would be a problem, would it not? It would absolutely be a problem under RUAN, subject to harmless error analysis, which is what I've been discussing, and the fact that there's overwhelming evidence of the defendant's subjective intent. And the district judge in this case did use reasonably believe. Yes, Your Honor, he did. This instruction certainly doesn't fully anticipate RUAN. However, as we note in our brief, the district court repeatedly referred to what the defendant believed. Did the defendant believe that he was doing something illegal? So it was a bit of a mix, and it certainly wasn't perfectly drafted to anticipate RUAN, but it certainly could be saved on this record because there was a focus repeatedly on the defendant's subjective mens rea. With respect to Edward Martin, the evidence in the case from Dr. Waldman and other places is that using alcohol or being a recovering alcohol addict is a very dangerous situation when you're prescribing oxycodone. In our appendix at pages 155 to 159, Dr. Waldman states in substance, if you're prescribing oxycodone to someone with an alcohol problem or someone who's actively drinking, you have to be very careful. By the way, that is essentially what's stated in the defendant's pain management contract at his appendix, sealed appendix at page 241, where he says that there's a dangerous situation if you have a previous addiction. What defense counsel is essentially saying is either the defendant believed that this individual, Edward Martin, was having a drink every day, well, the testimony and evidence in the case is that's very dangerous if you're giving him the highest strength oxycodone, or he believed that this individual, Edward Martin, had such a severe alcohol addiction that he was attending AA, not just vaguely attending AA, but attending AA every day with a sponsor. That means he had a very serious addiction. That means, as Dr. Waldman testified, if you were going to consider prescribing oxycodone to him, you would do it very carefully. You would do it after thorough diagnostic testing. You would order records. And if he had ordered records, he would have seen that the doctor that Edward Martin went to on the very same day, January 18, 2013, that he came to Dr. Belfiore, was cutting down on his oxycodone from 15 milligrams to 10 milligrams. Dr. Belfiore knows how dangerous oxycodone is. He said that to Michelle O'Toole in the second undercover video. He tells Detective Marinucci, the first undercover, that oxycodone can stop your breathing if you take it with something else. There's also disclaimers in the videos that the defendant touted at Governments Appendix 330, 333, 347, and 356, which were 14 years old by the time that he met with Edward Martin, that say it's very dangerous to use oxycodone with alcohol. Even his own expert acknowledged how dangerous it was. So whether or not he was using alcohol every day or was a recovering alcohol addict, it was very problematic. With respect to the interested witness instruction, this is not a credibility case like Solano, Your Honors. This is not a police officer says one thing, a defendant says another. He is in real time recorded stating the standard of care, in real time recorded violating the standard of care, in real time recorded making false entries. This is a case replete with documentary evidence of his guilt that goes far beyond anything that he said. With respect to Ortega, as I touched on before, Your Honors, that evidence was properly admitted as was the BME evidence to show the defendant's repeated prescriptions of oxycodone and his state of mind when prescribing it to the undercover. So for those reasons, we would ask that you affirm the conviction in all respects. Thank you. Thank you. We'll hear from Ms. Van Ness for two minutes of rebuttal. Your Honor, in reviewing the proof in this case, you have to look at the treatment of each patient individually. The government has focused entirely, virtually entirely, on his treatment of the two undercover officers to argue that the doctor knowingly always prescribed oxycodone unlawfully. In fact, the evidence of his treatment of patient Eubanks and Martin showed the contrary. He was presented with two patients who had documented chronic pain, including testing that showed that. He only saw Martin twice, but Martin was familiar with all of the drugs that Dr. Fiore ultimately agreed to prescribe including muscle relaxants and things that were, and substances that were not controlled because he had so many ailments and prior operation. Is this going to your sufficiency argument? I'm not sure I'm following. Well, that, I'm partly going to the sufficiency argument, but also to make a broader point that the government has not really focused on his treatment of Martin and Eubanks per se. In his argument, he just focused the court on how the doctor knew what was legitimate as evidenced by his treatment of the second undercover officer. He knew oxycodone was dangerous. He knew you needed to have a physical examination of the patient and so forth. And then he focused also in his argument on the second undercover officer, which was Marannucci. He did have objective indications of the physical ailments of the two patients who died. He did give physical examinations often to patient Eubanks. He didn't give one to Martin on his first visit because he had tests that were presented on the first visit that showed his nerve pain, that documented that. And Eubanks had already had a referral, the other patient, from the Carpenters Union physician documenting that he had sustained an injury at work. And that's why he was taking a leave of absence. So it's not fair to focus on the undercover officer where there was the most proof that the doctor wasn't prescribed legitimately, though I submit for the reasons stated in my brief that there's plenty of evidence that he treated Marannucci appropriately as well. But you can't just focus on that one patient. So this all sounds like this is argument for the jury, and some of it was made to the jury. I guess I'm not sure what you want us to do with this. Okay, the evidence can be construed different ways. I'm just pointing out that the government has essentially avoided talking about the other two patients. Mr. King just ticked off a whole bunch of things related to Martin, stop signs that the doctor ran through when prescribing the maximum dosage of oxycodone. Yes, and the government is contending that the proof of guilt in that for the patient Martin was also overwhelming. And one last point, Judge Sullivan. The jury heard all this, but they didn't get anywhere near the level of arguments that I presented to this court. The trial attorney was just not on. He was not focusing on all of the issues that I have raised. And I'm not talking about the charge errors, which he can't be faulted for, because they were based on law that came out after the conviction. But I'm talking about marshaling the evidence, focusing the expert on certain aspects of the proof that I have focused this court on. Right, but what do you want us to do with that? That sounds like it's an ineffective assistance. I'm not raising ineffective assistance. So what's the relevance of that to this review? Well, because your Honor said the jury heard all this, but they weren't focused on the deficiencies in the proof is what I'm saying. So their verdict, which took four and a half days, even being incorrectly charged can't be considered as pronounced with an understanding of all the deficiencies that are presented in the briefs, because they weren't arguing to the jury. All right. Well, that will do it for today. We will reserve decision. Thank you both.